FRANCES LOUISE TOOTHE v. CITY OF WILMINGTON, NORTH
CAROLINA, AND THE THALIAN ASSOCIATION, INC.

No. 705SC62

(Filed 27 May 1970)

**1. Trial § 21— nonsuit — consideration of evidence**

On a motion for judgment of nonsuit the evidence on behalf of the
plaintiff must be taken as true and considered in the light most favorable
to plaintiff, and all reasonable inferences therefrom which are favorable
to plaintiff must be drawn.

**2. Games and Exhibitions § 2— liability of proprietor to patrons**

One who, expressly or by implication, invites others to come upon his
premises to view an event being carried on therein has the duty to be
reasonably sure that he is not inviting them into danger and must exer-
cise reasonable care for their safety.

**3. Games and Exhibitions § 2— liability of arena proprietor — stand-
ard of reasonable care**

Since what constitutes reasonable care varies with the circumstances,
the vigilance required of the owner of the arena in discovering a peril
to the invitee and the precautions which he must take to guard against
injuries therefrom will vary with the nature of the exhibition, the por-
tion of the building involved, the probability of injury, and the degree of
injury reasonably foreseeable.

**4. Games and Exhibitions § 2— duty of arena proprietor — safety of
premises**

The law does not require the owner of an arena to take steps for the
safety of his invitees such as will unreasonably impair the attractiveness
of his establishment for its customary patrons.

**5. Games and Exhibitions § 2— duty of patrons**

Those who attend concerts and similar amusements or exhibitions must
anticipate that they will be conducted in the usual manner and surround-
ings; the duty of the owner is to use reasonable care under the circum-
stances.

**6. Games and Exhibitions § 2— patron's fall into orchestra pit — lia-
bility of sublessor to plaintiff — sufficiency of evidence**

In an action against the sublessor of a theater by a patron who was in-
jured when she fell into the orchestra pit, the patron's fall occurring
after the completion of a concert given by the sublessee, a church college
choir, plaintiff's evidence *is held* insufficient to establish the breach of any
duty owed to the plaintiff by the sublessor with regard to the sufficiency
of the lighting or the construction of the pit, where the evidence was to
the effect (1) that the sublessor had relinquished control and operation
of the premises to the sublessee for the concert, (2) that the choir leader,
and not the sublessor, had given directions for the lighting and the cur-
tains, and (3) that the sublessor was not responsible for the construction
of the pit and could not alter it, in any event, without approval of the
theater owner.

APPEAL by plaintiff from *Cohoon, J.,* 18 August 1969 Civil Session, NEW HANOVER Superior Court.

The plaintiff instituted this action for personal injuries received when she fell in a theater owned by the City of Wilmington and located in a wing of the City Hall. The City leased the theater premises to the co-defendant, The Thalian Association, Inc., (Thalian). At the close of the plaintiff's evidence, a judgment of nonsuit was entered as to both defendants. The plaintiff appealed from that portion of the judgment granting a nonsuit to the defendant Thalian. No appeal was taken as to the City.

The evidence discloses the following factual situation.

The lease from the City of Wilmington to Thalian provided that the City leased the hall to Thalian "including the dressing rooms, stage, hall, orchestra pit, balconies, lounges, ticket offices, portico and entries . . . ." The lease further provided that Thalian would maintain the premises and make repairs "as may be required for proper maintenances [*sic*] and fire prevention, provided, however, that all such improvements, betterments, interior alterations and expenditures of a nature to change the architectural character and purposes of the demised premises to be made by the lessee are first to be approved as to the nature and kind thereof by [the City]." "The lessee, its successors and assigns, are granted the right and privilege to sublet the demised premises for public gatherings, conferences, public entertainment and assembly; and the lessee agrees that it, and its successors and assigns, will make the said demised premises available from time to time for such public entertainment, gatherings and public conferences, and at all reasonable times when the demised premises are not actually required for use by the lessee."

Pursuant to the terms of its lease, Thalian made the hall available for the Berkshire Christian College Choir for 24 March 1967. The Berkshire Christian College is the theological school located in Lennox, Massachusetts, of the Advent Christian Church, a church denomination with several churches in the Wilmington, North Carolina, area. The plaintiff's husband, Frank Everett Toothe, is a clergyman and has served one of the churches of the denomination in the Wilmington area for some four years. Reverend Crocker of the Ogden Church was supposed to make the arrangements for the choir on behalf of the denomination, but Reverend Toothe did so for Reverend Crocker. Reverend Toothe paid $35.00 for the use of the hall on 24 March 1967. He testified,

". . . I went in to see what it was like, I had never been in.

That was some few days perhaps before March 24th. I looked over the facilities there and I noted the existence of the orchestra pit. I saw the poles there with the ropes around it up to the center aisle. I went there prior to the commencement of the concert on the night of the 24th, some period of time ahead of the concert. . . ."

The evidence discloses that the $35.00 paid for the use of the hall represented $25.00 for cleaning up the hall before and after the performance, and electricity and heat; and $10.00 for a Mr. Foster, who is a licensed electrician. Thalian required that Mr. Foster, or somebody like him, be present to operate the lighting equipment which "is quite complicated and just a casual sublessee would not be able to work it . . . ." Thalian gave no instructions to Foster when someone else was using the hall. In this regard Rev. Toothe testified that the choir leader from the Berkshire Choir "gave the directions as to what lights would be needed, and when the curtain would need to be opened and he told Mr. Foster this information."

Rev. Toothe further testified,

"I had seen that the orchestra pit was there and that it was depressed before the night of March 24th. . . . The purpose of having a depressed orchestra pit is to get the orchestra out of the vision of the audience."

The auditorium consisted of a raised stage, a center aisle with seats arranged in rows on each side of the center aisle and a balcony in the rear. There was a space of some 7 to 8 feet between the front row of orchestra seats downstairs and the edge of the depressed orchestra pit which was in front of the raised stage. The depth of the orchestra pit below the floor level was some 8 to 14 inches. Between the orchestra pit and the orchestra chairs, there were located metal posts supporting a large rope. The rope did not extend between the posts on each side of the center aisle so that it was possible to step from the center aisle into the orchestra pit. There have been no changes made in the interior arrangement of the hall since 1938, that is, artistically in the arrangement of the aisle, the orchestra pit and the stage.

The concert on this particular occasion was a public one, and the public had been invited by a newspaper advertisement inserted by Rev. Toothe. There was no admission charge but a free will offering.

The plaintiff, at the time of her fall, was a registered nurse in her early sixties. As the wife of the pastor of the church, she was

active in entertaining the choir by seeing that they received supper the night of the performance and that they got to the hall. She also helped in making the arrangements for housing them with members of the church congregation and seeing that they met their host and hostess. She had nothing to do with making arrangements for the use of the hall itself. She had never been in the hall before and got there just a few minutes before the concert began. She testified:

".  .  .  When the concert was over, as I said before, I was responsible for the students to get a place to stay and I checked and found that most of the students had made their contacts already with their host and hostess that were waiting in the lobby but this one boy so I proceeded down the center aisle to find Gayle Bailey. With respect to the difference in the lights, if any, between the time the concert was just getting over and the time it was over, it is hard to say, the lights were still dim, at least they had not been turned on bright. They were still dim in the auditorium. The appearance of the lighting on the stage of the auditorium immediately after the concert when I started walking down the aisle was very bright.

As to whether I could see the rope part the way around the orchestra pit before I got to it, I say, before I got to it there were people standing down there and you could see portions of it but not the whole rope. There was no one in the center aisle.

\*    \*    \*

With respect to the appearance of the orchestra pit as I walked along the aisle headed towards the stage, just the continued walkway of the floor that I was walking on of the aisle; I was — didn't see an orchestra pit, didn't seem like there was one there. There were no lights of any sort on the posts beside of the aisle that lead into the pit. There were no lights within the pit. There were no lights shining into the pit. As I walked forward down the aisle I was not talking to anyone, I was looking straight ahead, I was looking for some particular person, Gale Bailey, one of the students. As I walked down one of the other students, another student was on the platform and I called to him and said, 'Where is Gale?' By platform, I mean staging, whatever you want to call it.

I am five-two tall. With respect to the approximate height or my best estimate as to the approximate height of the stage above the floor level of the audience hall at the front of the hall, I say, I am sorry, but I didn't have to look up if that is what you

mean. I did not have to look up. Seems I was looking straight ahead, I didn't have to look up from where I was.

In comparing the lighting in the pit with the lighting in the hall and the lighting on the stage, I say, in that case I would say it was bright and it was dark and it was dim. From where I was walking down that aisle, I cannot recall that I could see any particular individual light or light bulb on the stage. I actually recall falling down into the pit. I could not give you an estimate of the depth of the pit below the floor right side of the pit, that is the floor of the hall, or how far I fell down into the pit. I have not seen that pit since, I do not know. I was so frightened that I could not tell you. It all happened so quickly I am sure — I just know I fell and it was a sudden shock. I don't recall seeing a table either within the orchestra pit or outside the pit. I don't recall it either with or without recording devices. I had not arranged to make any recordings myself and I have no knowledge that anyone else was. I do not recall seeing any recording devices in there."

The plaintiff further testified that as she walked down the aisle and reached the last row of seats before the orchestra pit, she called to someone on the stage,

". . . While I was talking to this person I was continuing to walk up, on up towards the stage. After he said that Gale was back I kept on going.

As to whether my attention was still directed to this person, I say, not necessarily because he had already — no, because he already had answered my question. I was not still carrying on a conversation with this person on the stage when I stepped off from the aisle into the orchestra pit. . . .

\* \* \*

I don't know where I was looking when I stepped off the aisle into the orchestra pit. I don't know now where I was looking at that time."

Plaintiff received serious injuries.

*Smith & Spivey for plaintiff appellant.*

*Marshall, Williams & Gorham by Lonnie B. Williams for defendant appellee, Thalian Association, Inc.*

CAMPBELL, J.

**[1]** On a motion for judgment of nonsuit the evidence on behalf of the plaintiff must be taken to be true and considered in the light most favorable to her and all reasonable inferences therefrom which are favorable to her must be drawn. *Aaser v. Charlotte,* 265 N.C. 494, 144 S.E. 2d 610 (1965).

**[2-5]** One who, expressly or by implication, invites others to come upon his premises to view an event being carried on therein, has the duty to be reasonably sure that he is not inviting them into danger and must exercise reasonable care for their safety. He is not an insurer of their safety and is liable only for injuries proximately caused by his failure to use reasonable care to discover and remove, or otherwise protect against, dangerous conditions, activities, or occurrences upon his premises. Since what constitutes reasonable care varies with the circumstances, the vigilance required of the owner of the arena in discovering a peril to the invitee and the precautions which he must take to guard against injuries therefrom will vary with the nature of the exhibition, the portion of the building involved, the probability of injury and the degree of injury reasonably foreseeable. The law does not require the owner to take steps for the safety of his invitees such as will unreasonably impair the attractiveness of his establishment for its customary patrons. Those who attend concerts and similar amusements or exhibitions must anticipate that they will be conducted in the usual manner and surroundings. The duty of the owner is to use reasonable care under the circumstances. *Aaser v. Charlotte, supra.*

The statement of the rule is much easier than the application thereof.

There are numerous cases in which the rules are set out and are applied to varying situations. In *Smith v. Agricultural Society,* 163 N.C. 346, 79 S.E. 632 (1913), a judgment of nonsuit was reversed where the plaintiff was attending a ballon ascension, his foot was caught in a rope attached to the ballon, and the plaintiff was taken on a ballon ride rather than simply remaining as a spectator. In *Williams v. Strickland,* 251 N.C. 767, 112 S.E. 2d 533 (1960), it was held that the complaint stated a good cause of action when the plaintiff alleged that the defendant, in operating an automobile race track, failed to provide patrons watching the race with proper seating or protective devices around the track in the way of adequate fences and barricades to prevent patrons from being injured. In this case a wheel came off one of the racing automobiles and struck the plaintiff.

In *Dockery v. Shows,* 264 N.C. 406, 142 S.E. 2d 29 (1965), a general concessionaire was held liable for the negligence of a sub-concessionaire when a patron was injured by one of the amusement devices which was inherently dangerous if precautions were not taken to assure the safety of the riders thereon.

In *Revis v. Orr,* 234 N.C. 158, 66 S.E. 2d 652 (1951), a dance hall proprietor was held not liable to a patron who fell over a chair outside of the ladies restroom door. The patron complained that the fall was due to the dim lights. It was held that a dance hall need not be brightly lighted.

In *Benton v. Building Co.,* 223 N.C. 809, 28 S.E. 2d 491 (1944), a patron opened a door from the lobby of a building into a cigar shop, failed to notice a step-down and fell. A judgment of nonsuit was sustained for that maintaining a difference in floor levels necessitating a step-down does not constitute negligence.

In *Cupita v. Country Club,* 252 N.C. 346, 349, 113 S.E. 2d 712 (1960), a judgment of nonsuit was sustained where a musician preparing to play for a club dance left the parking lot and took a shortcut across the premises and fell into a hole. The court said:

> " ' "The owner or occupant of premises is liable for injuries sustained by persons who have entered lawfully thereon only when the injury results from the use and occupation of that part of the premises which has been designed, adapted, and prepared for the accommodation of such persons." . . . If an invitee goes "to out-of-way places on the premises, wholly disconnected from and in no way pertaining to the business in hand" and is injured, there is no liability. [B]ut a slight departure by him "in the ordinary aberrations or casualties of travel" do not change the rule or ground of liability, and the protection of the law is extended to him "while lawfully upon that portion of the premises reasonably embraced within the object of his visit." . . . ' "

> "The owner or person in charge of premises has a duty to keep the premises which are within the scope of the invitation in a reasonably safe condition for an invitee's safety for all uses by an invitee in a manner consistent with the purpose of the invitation, but the owner or person in charge is not bound to keep them in a reasonably safe condition for uses which are outside of the scope and purpose of the invitation, for which the property was not designed, and which could not reasonably have been anticipated . . . ."

In *Harrison v. Williams*, 260 N.C. 392, 132 S.E. 2d 869 (1963), the plaintiff was directed by an employee of a restaurant to a cigarette machine which was at the end of a counter. In going to the cigarette machine the plaintiff did not anticipate a step-down when she came around the end of the counter in the restaurant and as a result fell and was injured. It was held that the plaintiff had failed to establish actionable negligence on the part of the defendant for that different floor levels in private or public buildings connected by steps are so common that the possibility of their presence is anticipated by prudent persons. Such construction is not an act of negligence unless by its character, location, or surrounding conditions a reasonably prudent person would not be likely to expect a step or see it.

[6]    In the instant case there is no evidence that the construction of the hall with a depressed orchestra pit some 8 to 14 inches below the main floor of the auditorium constituted negligent construction. There was no evidence that patrons attending the concert were expected to go down to the front of the hall after the concert was over when that was not the way to any exit and only led to the stage. In the instant case Thalian had subleased the premises and surrendered charge thereof to the Advent Christian denomination for the choir performance. Thalian was obligated to do this under the lease which it had with the city. Thalian was not responsible for the construction of the hall, and under its lease, could not have changed the construction of the orchestra pit without first procuring approval from the city which owned the premises. There was no inherent danger in the construction, and the type and manner of construction was observed by and known to the sublessee, Advent Christian denomination, which was in charge of putting on the performance. The choir leader, and not Thalian, had given the directions as to what lights would be needed and when the curtain would need to be opened. The evidence in this case reveals that Thalian had relinquished control and operation of the premises for this particular performance.

The evidence, in the light most favorable to the plaintiff, fails to establish any duty on the part of Thalian to the plaintiff which was breached and for which Thalian should respond in damages. We hold that the judgment of nonsuit was proper.

Affirmed.

PARKER and VAUGHN, JJ., concur.